2020 PA Super 239

| | | |
|---|---|---|
| MARK AND LEAH GUSTAFSON, INDIVIDUALLY AND AS ADMINISTRATORS AND PERSONAL REPRESENTATIVES OF THE ESTATE OF JAMES ROBERT ("J.R.") GUSTAFSON | : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellants | : : | |
| v. | : : : | No. 207 WDA 2019 |
| SPRINGFIELD, INC. D/B/A SPRINGFIELD ARMORY AND SALOOM DEPARTMENT STORE AND SALOOM DEPT. STORE, LLC D/B/A SALOOM DEPARTMENT STORE; | : : : : : : | |
| Appellees | : : | |
| THE UNITED STATES OF AMERICA, | : : | |
| Intervenor | : | |

Appeal from the Order Entered January 15, 2019
In the Court of Common Pleas of Westmoreland County
Civil Division at No(s):  1126 of 2018

BEFORE:  BENDER, P.J.E., KUNSELMAN, J., and MUSMANNO, J.

OPINION BY KUNSELMAN, J.:          **FILED SEPTEMBER 28, 2020**

In this appeal, we must decide whether the trial court erred by finding that a federal statute, the Protection of Lawful Commerce in Arms Act of 2005 ("the PLCAA"), 15 U.S.C. §§ 7901-7903, bars a state lawsuit arising from the shooting death of Mark and Leah Gustafson's 13-year-old son, James Robert ("J.R.") Gustafson.  The Gustafsons claim that the PLCAA should not apply to their lawsuit or, alternatively, that it is unconstitutional.

On March 20, 2016, J.R. Gustafson and his 14-year-old friend visited a Westmoreland County home owned by Joshua Hudec.[1] J.R.'s friend obtained Mr. Hudec's Springfield Armory, semiautomatic handgun, model XD-9. **See** Gustafsons' Complaint at 5. The friend removed the handgun's clip and therefore believed it "was unloaded, because . . . there were no adequate indicators or warnings to inform him that a live round remained in the chamber." **Id.** at 6.

"Thinking the handgun was unloaded, the boy pulled the trigger." **Id.** The chambered bullet fired and unintentionally killed J.R. The District Attorney of Westmoreland County charged J.R.'s friend with general homicide under the Pennsylvania Crimes Code. The friend eventually pleaded delinquent to involuntary manslaughter[2] in juvenile court.

Mark and Leah Gustafson, as Administrators of J.R.'s estate and in their own right as surviving kin, then sued Springfield Armory, Inc. and Saloom Department Store ("Gun-Industry Defendants").[3] The Gustafsons asserted

---

[1] We take these facts from the Gustafsons' complaint, because the trial court sustained the defendants' preliminary objections in the nature of a demurrer. Hence, we must accept the Gustafsons' factual allegations as true for purposes of this appeal. **See Mazur v. Trinity Area Sch. Dist.**, 961 A.2d 96 (Pa. 2008). The complaint does not indicate what role, if any, Mr. Hudec played in these events or whether he was at home when they occurred.

[2] 18 Pa.C.S.A. § 2504(a).

[3] Springfield Armory, which made the gun, has its principal place of business and incorporation in Illinois. Springfield Armory did not contest the trial

- 2 -

that, under the common law of Pennsylvania, the Gun-Industry Defendants were negligent and strictly liable for manufacturing and/or selling the defective handgun that caused their son's death. *See id.* at 13-25. They alleged a design defect, because the gun lacked a safety feature to disable it from firing without the clip attached. They believe this defect, along with the 14-year-old friend's criminal misuse of the handgun, caused J.R.'s death. The Gustafsons also averred the Gun-Industry Defendants did not adequately warn the 14-year-old that a live round was still in the chamber after he had removed the clip.

After receiving the complaint, the Gun-Industry Defendants immediately sought dismissal of the action through preliminary objections in the nature of a demurrer.[4] They asserted immunity from all of the Gustafsons' common-law causes of action. *See* Preliminary Objections at 5. The Gun-Industry

---

court's *in personam* jurisdiction. Saloom Department Store, the Pennsylvania corporation that sold the handgun, operates in Westmoreland County. All parties agree they are a "Manufacturer" and a "Seller" as Congress defined those terms in the PLCAA.

[4] The Gun-Industry Defendants' assertion of immunity was premature, and they erroneously raised it as a preliminary objection. The Pennsylvania Rules of Civil Procedure require defendants to raise affirmative defenses, such as immunity from a lawsuit, as new matter in their answer to a complaint. *See* Pa.R.C.P. 1030(a). However, because the Gustafsons did not file a preliminary objection to the Gun-Industry Defendants' preliminary objections in the nature of a demurrer, they waived any objection to the Defendants' procedural error. Thus, the issues of PLCAA immunity and the Act's constitutionality are properly before us in this appeal.

Defendants argued the PLCAA prevented the trial court from holding them civilly liable for J.R.'s death, even if the Gustafsons could convince a jury the Defendants had committed torts under Pennsylvania law.

The Gustafsons responded that the PLCAA does not apply here. In the alternative, they argued the Act is unconstitutional, because it (1) overrides Tenth Amendment principles of federalism, (2) cannot be sustained under the Commerce Clause,[5] and (3) violates the Fifth Amendment. Upon learning of the Gustafsons' constitutional attacks against its statute, the United States of America ("Federal Government") intervened to defend the PLCAA. It claimed Congress properly enacted the PLCAA under the Commerce Clause and Bill of Rights.

The trial court concluded the PLCAA barred all of the Gustafsons' causes of action, upheld the Act as being constitutional, and sustained the preliminary objections. This timely appeal followed.

The Gustafsons raise two appellate issues:

1. Does [the PLCAA] bar [their] claims?

2. Does the United States Constitution permit [the] PLCAA to bar Pennsylvania courts from applying Pennsylvania law to provide [them] civil justice?

Gustafsons' Brief at 3.

Our scope and standard of review are the same for both issues. "When an appellate court rules on whether preliminary objections in the nature of a

---

[5] U.S. Const. art. I, § 8. cl. 3.

- 4 -

demurrer were properly sustained, the standard of review is *de novo*, and the scope of review is plenary." ***Mazur v. Trinity Area Sch. Dist.***, 961 A.2d 96, 101 (Pa. 2008). We affirm an order sustaining preliminary objections "only when, based on the facts pleaded, it is clear and free from doubt that the complainant will be unable to prove facts legally sufficient to establish a right to relief." ***Id.*** Also, this Court "must accept as true all well-pleaded, material, and relevant facts alleged in the complaint and every inference that is fairly deducible from those facts." ***Id.***

## I.

First, we consider whether the trial court correctly concluded that the text of the PLCAA bars the Gustafsons' lawsuit. Where, as here, the language of a federal statute is clear and unambiguous, statutory analysis "begins, and pretty much ends, with the text." ***Lomax v. Ortiz-Marquez***, 590 U.S. ___, ___, 140 S. Ct. 1721, 1724 (2020).

Congress divided the PLCAA into three sections: Section 7901 (findings and purposes), Section 7902 (the operable provisions), and Section 7903 (the definitional provisions). Section 7902 dictates that a "qualified-civil-liability action may not be brought in any federal or state court" against members of the gun industry. Such a lawsuit "shall be immediately dismissed by the court in which the action was brought or is currently pending." 15 U.S.C. § 7902. To determine which types of lawsuits Congress mandated that courts dismiss, we turn to Section 7903 to ascertain the meaning of "qualified-civil-liability action."

- 5 -

Congress defined "qualified-civil-liability action," as any:

> civil action or proceeding or an administrative proceeding brought by any person against a manufacturer or seller of a [firearm or an ammunition that moved through interstate commerce] for damages, punitive damages, injunctive or declaratory relief, abatement, restitution, fines, or penalties, or other relief, resulting from the criminal or unlawful misuse of [that firearm or ammunition] by the [plaintiff] or a third party, but **shall <u>not</u> include** (i) an action brought against a transferor convicted under section 924(h) of Title 18, or a comparable or identical State felony law, by a party directly harmed by the conduct of which the transferee is so convicted; (ii) an action brought against a seller for negligent entrustment or negligence *per se*; (iii) an action in which a manufacturer or seller of a qualified product knowingly violated a State or Federal statute applicable to the sale or marketing of the [firearm or ammunition], and the violation was a proximate cause of the harm for which relief is sought . . . (iv) an action for breach of contract or warranty in connection with the purchase of the product; (v) an action for death, physical injuries or property damage resulting directly from a defect in design or manufacture of the [firearm or ammunition], when used as intended or in a reasonably foreseeable manner, except that where the discharge of the [firearm or ammunition] was caused by a volitional act that constituted a criminal offense, then such act shall be considered the sole proximate cause of any resulting death, personal injuries or property damage; or (vi) an action or proceeding commenced by the Attorney General [of the Untied States] to enforce the provisions of chapter 44 of Title 18 or chapter 53 of Title 26 [of the United States Code].

15 U.S.C. § 7903(5)(A) (emphasis added).

To date, all courts that have considered the PLCAA agree that if (1) none of those six exceptions apply, (2) the plaintiff or a third party commits **any** crime with the firearm or ammunition at issue, and (3) that firearm or ammunition has crossed state lines, then the PLCAA immunizes the gun

industry from a plaintiff's lawsuit. However, if one or more of the exceptions applies, courts disagree on whether the PLCAA still bars a plaintiff's other causes of action.

Some courts, including the trial court here, have agreed with the gun industry that only the causes of actions allowed by the exceptions to the definition of "qualified-civil-liability action" remain viable. ***E.g.***, ***Delana v. CED Sales***, 486 S.W.3d 316 (Mo. 2016) (allowing plaintiff's negligent-entrustment count to proceed under Exception (ii) but not her negligence count). ***See also Estate of Kim ex rel. Alexander v. Coxe***, 295 P.3d 380, 386 (Ak. 2013) ("reading a general-negligence exception into the statute would make the negligence-*per-se* and negligent-entrustment exceptions a surplusage"). The trial court, finding ***Kim*** "convincing," followed this line of precedents. Trial Court Opinion, 1/15/19, at 7 (citations omitted).

Other courts, however, have read the plain language in the definition of "qualified-civil-liability action" literally. They have agreed with plaintiffs that "qualified-civil-liability action" refers to the "civil action" as a whole, not to specific causes of action within complaints. Those courts have concluded that, if the finder of fact determines that an exception to the definition of "qualified-civil-liability action" exists, then the plaintiff's lawsuit is not a "qualified-civil-liability action." Hence, the PLCAA simply does not apply, and the gun industry receives no immunity from any of the individual counts. ***E.g.***, ***Williams v. Beemiller, Inc.***, 952 N.Y.S.2d 333, 363 (4th Dep't 2012) (permitting counts for negligent distribution, negligent entrustment, negligence *per se*, and public

nuisance to proceed to trial, because plaintiff alleged gun-industry members violated "federal, state, and local legislative enactments" thereby implicating Exception (iii)). *See also* ***Norberg v. Badger Guns, Inc.***, WI 10-CV-20655 (C.C. Milwaukee 2014) (N.T., 1/30/14, at 7-8) (denying summary judgment to gun-industry defendants on counts of ordinary negligence, negligent entrustment, civil conspiracy, and aiding and abetting, because evidence existed from which a jury could find the defendants in violation of the Gun Control Act); and ***City of New York v. A-1 Jewelry & Pawn, Inc.***, 247 F.R.D. 296 (E.D.N.Y. 2007) (accord).

Unlike the trial court, we adopt the latter construction. The definition of "qualified-civil-liability action" does not mention "cause of action," "theory of liability," "count," or "claim." Instead, Congress defined "qualified-civil-liability action" as a "***civil action or proceeding*** or an administrative ***proceeding***." 15 U.S.C. § 7903(5)(A) (emphasis added). Thus, the term refers to a plaintiff's lawsuit or proceeding as a whole, not to specific causes of action advanced within that lawsuit. If a plaintiff's civil action falls within an exception to the definition of "qualified-civil-liability action," the civil action is not a "qualified-civil-liability action." The PLCAA commands trial courts to dismiss a "qualified-civil-liability action that is pending on October 26, 2005," but 15 U.S.C. § 7902(b) makes no mention of "causes of action." Nor does the definition of "qualified-civil-liability action." 15 U.S.C. § 7903(5)(A).

In fact, that very term — qualified-civil-liability ***action*** — supports our interpretation. Otherwise, Congress, which used the phrase "cause of action"

elsewhere in the PLCAA, **e.g.**, 15 U.S.C. § 7903(5)(C), would have coined the term as "qualified-civil-liability **cause of action**," rather than "qualified-civil-liability **action**." When "Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." **Russello v. United States**, 464 U.S. 16, 23, (1983). Thus, the plain text of the PLCAA dictates that either the gun industry has immunity from the entire lawsuit or no immunity at all. The Act does not immunize the industry from individual causes of action.

Therefore, the trial court erred when it applied the PLCAA on a claim-by-claim basis rather than to the entire lawsuit. Its reliance upon **Kim**, **supra**, was therefore misplaced.[6] The PLCAA requires dismissal of a plaintiff's entire

---

[6] We find the logic of the Supreme Court of Alaska in **Kim** unpersuasive. That court erroneously believed that allowing claims for ordinary negligence (or any other cause of action based in negligence) would render the PLCAA's exception for claims of negligence *per se* and negligent entrustment surplusage. That court and the trial court misunderstood the PLCAA's goal, which is to protect only those members of the gun industry who obey state or federal statutes from common-law liability. As we will explain below, Congress passed the PLCAA to immunize what they considered to be **law-abiding** members of the industry — in Congress's mind, those who follow federal and state statutes.

Because all of the exceptions in the definition of "qualified-civil-liability action" are statutory violations, Exception (ii) is **not** surplusage if, as we now hold, the gun industry's violation of it (or any other exception) renders the PLCAA inapplicable. Violators of any federal or state statute are not law-abiding industry members in Congress's view. Thus, if a member of the gun-industry violates a federal or state statute, Congress would naturally not wish to extend any PLCAA immunity to such a lawbreaker.

lawsuit if **the facts of the case** meet the definition of a qualified-civil-liability action.

Regarding the "criminal or unlawful misuse" that brings a lawsuit within the general definition of a "qualified-civil-liability action," the "term 'unlawful misuse' means conduct that violates a statute, ordinance, or regulation as it relates to the use of a [firearm or ammunition]." 15 U.S.C. § 7903(9). Any crime will suffice, even the unlawful possession of the gun itself.

For instance, in **Ryan v. Hughes-Ortiz**, 959 N.E.2d 1000, (Ma. App. 2012), a man was returning a Glock to his employer's display case, when the handgun accidentally discharged and killed him. The administratrix of his estate sued Glock for defectively designing both the gun and the display case that had failed to stop the stray bullet. The plaintiff argued the PLCAA did not apply, because the decedent had not "misused" the handgun in any way. 15 U.S.C. § 7903(5)(A). The appellate court disagreed. It opined that the decedent had been a convicted felon who had unlawfully possessed the gun and committed a federal offense[7] by holding the weapon – *i.e.*, a "criminal or

_____

For example, once a plaintiff proves that a gun-industry member has violated the PLCAA's definition of "negligent entrustment," 15 U.S.C. § 7903(5)(B), it would not matter to Congress if that industry member were also liable for, say, ordinary negligence. That defendant is already liable to the plaintiff under the PLCAA's definition of "negligent entrustment," and the state judiciary need not expand the common law to impose liability or damages upon a law-abiding member of the gun industry.

[7] 18 U.C.S. § 922(g)(1); **see also United States v. Tann**, 577 F.3d 533, 534 (3d Cir. 2009).

- 10 -

unlawful misuse" of the gun under the PLCAA. ***Ryan***, 959 N.E.2d at 1008. The PLCAA therefore immunized Glock from liability that might have otherwise attached under Massachusetts law.

Similar to the plaintiff in ***Ryan***, the Gustafsons urge that the PLCAA does not apply. But, as in ***Ryan***, the Act's plain language bars this lawsuit. J.R. died when his friend committed the Pennsylvania crime of involuntary manslaughter by unintentionally firing a bullet at him. Thus, this case meets the definition of a "qualified-civil-liability action." Also, because Mr. Hudec's handgun crossed state lines, it is a PLCAA "qualified product." ***See*** 15 U.S.C. § 7903(4).

The Gustafsons, however, claim the text of the PLCAA is unclear. They assert the Act does not apply, because: (1) its first section indicates that Congress only sought to bar cases for harm ***solely*** caused by the criminal acts of others, (2) the legislative history shows Senators did not intend to eliminate cases like the one at bar, and (3) PLCAA Exception (v) applies. Alternatively, they claim we should narrowly construe the PLCAA to avoid the possibility of unconstitutional federal encroachment into the States' police power – specially, the law of torts. ***See*** Gustafson's Brief at 7-8 (citing ***Bond v. United States***, 572 U.S. 844 (2014); and ***Gregory v. Ashcroft***, 501 U.S. 452 (1991)).

A.    *The Purposes & Findings*

First, the Gustafsons claim Congress only desired dismissal of lawsuits where criminal actors "solely caused" the alleged harm. According to the

Gustafsons, lawsuits such as theirs, where the gun industry's affirmative conduct or negligent omissions allegedly contributed to the harm, do not qualify. Thus, the Gustafsons believe the phrase "solely caused" in Section 7901(b)(1) refutes the trial court's decision to dismiss their case. They also contend that the adverb "solely" carries special weight, because its addition to Section 7901 helped the bill to pass.

Section 7901(b)(1) of the PLCAA indicates that one of Congress's goals under the PLCAA is "to prohibit causes of action against [the gun industry] for the harm **solely caused** by the criminal or unlawful misuse of firearm products or ammunition products by others." 15 U.S.C. § 7901(b)(1) (emphasis added). However, we cannot rely on the findings and purposes of the Act to override plain text of its operable sections. Congressional findings and purposes are not law; only a statute's operable sections are law.

The Supreme Court of the United States has long held that, "[R]ecitals . . . in section 1 (which [are] simply a preamble to the act) . . . do not constitute an exertion of the will of Congress which is legislation, but a recital of considerations, which, in the opinion of [Congress], existed and justified the expression of its will in the present act." **Carter v. Carter Coal Co.**, 298 U.S. 238, 290, (1936). Thus, while findings and purposes may assist a court in deciding if Congress legislated constitutionally, that section does not trump a law's unambiguous, operative terms. **See id**; **see also Lomax**, **supra**. The Gustafsons' first statutory-construction theory therefore fails to convince us that the plain language of Sections 7902 and 7903 should not apply.

*B.     The Congressional Record*

Second, the Gustafsons' arguments regarding the legislative history of the Act are equally unpersuasive.  They maintain that the trial court erred in dismissing this case, because the "legislative history indicates an intent not to bar cases like this."  Gustafsons' Brief at 27.

To be sure, Senator Larry Craig, the author and lead sponsor of the PLCAA, told Congress his bill would **not** protect gun-industry members if they had broken any laws.  He said that the PLCAA "prohibits one narrow category of lawsuits:  suits against the firearms industry for damages resulting from the criminal or unlawful misuse of a firearm or ammunition by a third party." 151 Cong. Rec. S9,061 (daily ed. July 27, 2005) (Sen. Craig).  "Over two dozen suits have been filed on a variety of theories, but all seek the same goal of forcing **law-abiding businesses** selling a **legal product** to pay for damages from the criminal misuse of that product."  **Id.** (emphasis added). The PLCAA "is not a gun-industry-immunity bill, because it does not protect firearms or ammunition manufacturers, sellers, or trade associations from **any other lawsuits based on their own negligence or criminal conduct.**" **Id.** (emphasis added).[8]

---

[8] Other Senators expressed similar sentiments.  "[T]his bill carefully preserves the rights of individuals to have their day in court with civil liability actions where negligence is truly an issue."  (151 Cong. Rec. S9,077 (daily ed. July 27, 2005) (Sen. Hatch)); "This bill . . . will not shield the industry from its own wrongdoing or from its negligence."  (151 Cong. Rec. S9,107 (daily ed. July 27, 2005) (Sen. Baucus)); "This legislation does carefully preserve the right

Despite these statements from Senator Craig, we may not consider the intentions of individual Members of Congress when interpreting unambiguous text, even if that text produces a result that the drafters failed to anticipate. For example, in the recent Supreme Court case of **Bostock v. Clayton County, Georgia**, 590 U.S. ___, 140 S. Ct. 1731 (2020), the Court held that Title VII of the Civil Rights Act of 1964 protects the LGBTQ+ community from employment discrimination even though the Congress that passed that law neither intended nor foresaw such an outcome.

As Justice Gorsuch candidly stated at the outset of the decision:

> Those who adopted the Civil Rights Act might not have anticipated their work would lead to this particular result. Likely, they weren't thinking about many of the Act's consequences that have become apparent over the years, including its prohibition against discrimination on the basis of motherhood or its ban on the sexual harassment of male employees. But the limits of the drafters' imagination supply no reason to ignore the law's demands. When the express terms of a statute give us one answer and extratextual considerations suggest another, it's no contest. **Only the written word is the law** . . . .

**Id.**, 590 U.S. at ___, 140 S. Ct. at 1737 (emphasis added).

Like the shortsightedness of the 88th Congress that passed Title VII, the 109th Congress that passed the PLCAA (including its author) may not have envisioned the full breadth of immunity that the PLCAA would grant the gun

_____

of individuals to have their day in court with civil liability actions for injury or danger caused by negligence of the firearms dealer or manufacturer." 151 Cong. Rec. S9,389 (daily ed. July 29, 2005) (Sen. Allen).

industry. Even so, the "limits of the drafters' imagination supply no reason to ignore the law's demands." *Id.*

C.      *The PLCAA's Product-Defect Exception*

In their third argument, the Gustafsons claim their lawsuit does not meet the definition of a "qualified-civil-liability action," because Exception (v) within that definition applies. It does not.

Congress, as explained above, listed six exceptions to the definition of a "qualified-civil-liability action." Of the six exceptions, only the fifth could arguably apply to the allegations in the Gustafsons' complaint. Exception (v) seemingly allows lawsuits to proceed if the firearm or ammunition was "used as intended or in a reasonably foreseeable manner . . . ." 15 U.S.C. § 7903(5)(A)(v). This Exception, however, contains a critical caveat that if "the discharge of the product was caused by a volitional act that constituted a criminal offense, then such act shall be considered the sole proximate cause of any resulting death, personal injuries, or property damage." *Id.* That caveat renders Exception (v) toothless, because *all* criminal offenses require a *volitional* act.[9] Any time a defective gun causes harm and a criminal offense also occurs, Exception (v) cannot apply. This is true even when, as

_____

[9] This is basic criminal law. For example, in Pennsylvania, "A person is not guilty of an offense unless his liability is based on conduct which includes a *voluntary* act or the omission to perform an act of which he is physically capable." 18 Pa.C.S.A. § 301(a) (emphasis added). The courts may "not impose criminal liability on a person for an involuntary act." *Commonwealth v. Lamonda*, 52 A.3d 365, 369 (Pa. Super. 2012).

here, the result of that act is unintentional. ***See Ryan***, 959 N.E.2d 1000 (dismissing lawsuit, despite the fact that the gun discharged on its own and no criminal charges were filed against decedent).

At first blush, Exception (v) seems to allow lawsuits to proceed if the plaintiffs plead and prove a product defect. However, a caveat in Exception (v) dictates that the PLCAA-triggering offense must also be deemed the ***sole proximate cause*** of the harm. This caveat negates the proximate cause necessary for a product-defect claim against the gun industry to succeed. With one hand, Exception (v) excludes product-defect lawsuits from the definition of "qualified-civil-liability action," but, with the other hand, Exception (v) extinguishes the very tort that activates it.

This exact scenario occurred in ***Adames v. Sheahan***, 909 N.E.2d 742 (Ill. 2009), cert. *denied* sub nom. ***Adames v. Beretta U.S.A. Corp.***, 558 U.S. 1100 (2009). There, on facts identical to those in the Gustafsons' complaint, Exception (v) failed to save the plaintiffs' lawsuit from dismissal. In ***Adames***, a teenager found a handgun inside a home. The boy knew the gun was loaded if the magazine was connected, but he thought it was unloaded without it. He removed the magazine and pointed what he believed was an unloaded gun at his friend, jokingly pulled the trigger, and killed him. A juvenile court found the shooter delinquent of involuntary manslaughter and reckless discharge of a firearm. The victim's parents sued the manufacturer of the gun for product liability (design defect and failure to warn about the bullet concealed in the chamber). While the case was proceeding, Congress passed the PLCAA.

The Supreme Court of Illinois held the general rule of the PLCAA applied and required dismissal. It reasoned that the shooter criminally misused the gun, because his actions were state crimes, regardless of his intent or the fact that he was tried as a juvenile instead of as an adult. *Id.* Also, rejecting the plaintiffs' reliance upon Exception (v), the court reasoned that the caveat in Exception (v) "requires only that the volitional act constitute a criminal offense. As discussed . . . shooting [the victim] constituted a criminal offense." *Id.* at 763.

*Adames* demonstrates the hollowness of Exception (v). The criminal act that implicates the definition of a "qualified-civil-liability action," will also *always* be a violation criminal act that nullifies Exception (v). Thus, this claim affords the Gustafsons no relief.

D.     *The Canon of Constitutional Avoidance*

Finally, citing to *Bond v. United States* and *Gregory v. Ashcroft*, *supra*, the Gustafsons request that we narrowly construe the PLCAA pursuant to the canon of statutory construction of constitutional avoidance.[10]  When that canon applies, even the plain text of a statute may yield to a presumption that the legislature does not willingly test constitutional limits. Based on that presumption, the Supreme Court has said, "Unless Congress conveys its

_____

[10] While similar, the canon of constitutional avoidance should not be confused with the principle of judicial restraint that requires courts to attempt to avoid constitutional questions. Under the latter practice, a court only reaches a constitutional issue if it cannot resolve a case on other grounds. *See* Nelson, *Avoiding Constitutional Questions Versus Avoiding Unconstitutionality*, 128 Harv. L. Rev. F. 331 (2015).

purpose clearly, it will not be deemed to have significantly changed the federal-state balance." ***Solid Waste Agency of N. Cook County v. U.S. Army Corps of Engineers***, 531 U.S. 159, 173, (2001) (some punctuation omitted). Hence, if "a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter." ***MCI WorldCom, Inc. v. Pennsylvania Public Utility Commission***, 844 A.2d 1239, 1249 (Pa. 2004) (citing ***Harris v. United States***, 536 U.S. 545, 555, (2002) and ***United States ex rel. Attorney General v. Delaware Hudson Co.***, 213 U.S. 366, 408, (1909)).

In ***Bond***, pursuant to a treaty the United States had entered, Congress criminalized the possession and use of chemical weapons. No one doubted Congress's power to make the treaty or to enforce it by criminal statute. Several years later, a scorned wife harassed her husband's mistress by putting a non-lethal amount of chemicals on the other woman's car door and in her mailbox. When the District Attorney of Montgomery County refused to press charges, the Federal Government indicted Bond for violating its anti-chemical-weapons statute. The district court convicted her, and Bond's appeals reached the Supreme Court, twice.

The High Court worried that the Federal Government's interpretation of the statute, although rooted in the plain text, raised grave Tenth Amendment questions and potentially usurped this Commonwealth's police power. The Court therefore construed the statute narrowly to exclude Bond's conduct from

the federal act based on the presumption that Congress would not intend a constitutionally dubious result without clearly expressing an intention to invade Pennsylvania's sovereignty. Pursuant to the statutory-construction canon of constitutional avoidance, the Court narrowly construed the statute to maintain the traditional state-federal balance.

Here, unlike the statutes in **Bond** and **Gregory**,[11] which Congress clearly had the power to enact, the PLCAA does not offer two interpretations, "by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided." **MCI WorldCom**, **supra**. All applications of the PLCAA raise grave and doubtful constitutional questions, because it extinguishes **_every_** cause of action at common law.

The trial court and Federal Government suggest the Act only prohibits certain common-law claims, while permitting others under its six exceptions. We disagree. As this Court's review of those exceptions reveals, the PLCAA only permits a lawsuit to proceed if the gun industry violates a state or federal statute. The six exceptions do not involve any common-law causes of action.

Exception (i), for instance, purportedly allows lawsuits against a gun-industry "transferor" if the Federal Government convicts it of "transferring a

_____

[11] In **Gregory v. Ashcroft**, 501 U.S. 452 (1991), involved Missouri judges' unsuccessful allegations that mandatory retirement ages under that State's constitution violated the Age Discrimination in Employment Act ("ADEA"). No one argued that Congress lacked the power to enact the ADEA, but whether, under the Tenth Amendment, it could reform Missouri's judicial systems was another issue entirely. Because Congress had not clearly included state judges within the ADEA, the Court interpreted the act as excluding them.

firearm, knowing that such firearm will be used to commit a crime of violence . . . or drug trafficking crime," 18 U.S.C. § 924(h), or after any State convicts the "transferor" under "a comparable or identical state felony law." 15 U.S.C. § 7903(5)(A)(i). Thus, the victim's harm must be "directly caused by the conduct of which the **transfer_ee_** is so convicted." **_Id._** (emphasis added). The exception applies only if the gun industry knowingly acted in concert with another criminal in violation of a criminal statute, and they are both convicted. Moreover, such a victim would be entitled to a judgment of restitution at the gun industry's sentencing and, therefore, would not need a lawsuit to recover. Our research reveals no court ever permitting a lawsuit to proceed under Exception (i) or any plaintiffs even arguing that it applied. Exception (i) might look good on paper, but it has no real-world implications.

Exception (ii) authorizes actions "brought against a seller for negligent entrustment or negligence *per se*." 15 U.S.C. § 7903(5)(A)(ii). This exception would permit state courts to apply the common-law tort of negligent entrustment, if Congress had not defined "negligent entrustment" at 15 U.S.C. § 7903(5)(B). Congress therefore set a national, **statutory** standard for the gun industry, if a plaintiff alleges negligent entrustment.

Likewise, negligence *per se* allows cases to proceed only if the gun industry violated a statute. Regarding negligence *per se*, the "standard of conduct is taken over by the court from that fixed by the legislature" in statutes or ordinances. **_Bumbarger v. Kaminsky_**, 457 A.2d 552, 555 (Pa. Super. 1983) (quoting Prosser, THE LAW OF TORTS § 36 at 200 (4th ed. 1971)).

- 20 -

Hence, the legislature must define the gun industry's duty of care under Exception (ii), not the courts.

Exception (iii) permits actions to proceed if based on "a state or federal statute applicable to the sale or marketing of the product." 15 U.S.C. § 7903(5)(A)(iii). Clearly, this exception is not based upon common-law claims.

Exception (iv) allows lawsuits based on breach of contract and warranty relating to the sale of firearms. 15 U.S.C. § 7903(5)(A)(iv). This exception likewise requires plaintiffs to prove statutory violations, because all 50 States have adopted the Uniform Commercial Code ("the UCC").[12] Contracts and warranties regarding the gun industry's "qualified products," 15 U.S.C. § 7903(5)(A), are not subject to the common law, as those "qualified products" are also "goods"[13] under the UCC. Thus, the UCC applies to any "action for breach of contract or warranty in connection with the purchase of a qualified product," 15 U.S.C. § 7903(5)(A)(iv), not the common law of assumpsit.

Exception (v) never preserves the common law of product defect. As **Ryan**, **Adames**, and this case demonstrate, the exception's caveat renders it a nullity.

_____

[12] Even Louisiana, America's only non-common-law State, has adopted parts of Article II of the UCC into its Civil Code of Sales. Rasmussen, *The Uneasy Case against the Uniform Commercial Code*, 62 La. L. Rev. 1097 n.1 (2002).

[13] "Goods" for purposes of Article II of the UCC are "things (including specially manufactured goods) which are movable at the time of identification to the contract." 13 Pa.C.S.A. § 2105(a); **see also** UCC, Art. II, § 105(a).

Finally, Exception (vi) permits the Attorney General of the United States to bring lawsuits based upon "chapter 44 of Title 18 or chapter 53 of Title 26." 15 U.S.C. § 7903(5)(A)(vi). Obviously, this last exception allows no claims at common law, because those suits are based on violations of federal statutes.

The PLCAA therefore grants total immunity from common-law liability to the gun industry. Congress has dictated that responsibility under state tort law must fall solely on criminals and the victims of gun injuries whenever the PLCAA applies.[14] Before the PLCAA, under States' laws, gun-shot victims could be both victims of crime and victims of gun-industry torts.

But now, if a State exercises its police power to criminalize a shooting, then the PLCAA strips that State of its tort-based police power to hold the gun industry financially responsible. The PLCAA therefore forces the States into a Hobson's choice: either punish local crimes or compensate victims fully for tortious wrongs. Congress, in the PLCAA, undoubtedly undertook a radical reformation of the traditional state-federal balance. Therefore the canon of constitutional avoidance that applied in **Gregory** and **Bond** does not extend to the PLCAA; federal overreach arises (and will continue to arise) in every PLCAA case.

---

[14] If the gun industry's tort victim commits a criminal offense, even a nonviolent one such as unlawful possession of a firearm, Congress revived "the harshest doctrine known to the common law of the nineteenth century," namely, contributory negligence, to put the victim or his heirs out of court. Shrager & Shepherd, *History, Development, and Analysis of the Pennsylvania Comparative Negligence Act: An Overview*, 24 Vill. L. Rev. 422, 425 (1979).

Congress has therefore clearly rebutted the presumption of statutory construction that it avoids constitutional risk-taking. Hence, the trial court correctly ruled that the Gustafsons' lawsuit meets the definition of "qualified-civil-liability action" and that the PLCAA's plain language calls for the dismissal of their complaint. All contentions to the contrary fall short.

The Gustafsons' first appellate is meritless.

## II.

For their second issue, the Gustafsons challenge the constitutionality of the PLCAA. Among other arguments, they claim that Congress violated the Tenth Amendment, because the PLCAA infringes on powers reserved to the States.[15] They further disagree with the Federal Government's contention that Congress properly enacted the PLCAA under its Commerce Clause power in Article I of the Constitution of the United States. Specifically, the Gustafsons argue that the PLCAA improperly regulates the States' abilities to apply their respective common laws, rather than the conduct of private individuals.

The Tenth Amendment and Congress's Article I powers are interrelated. They, along with other constitutional provisions, create the system known as federalism and checks and balances within the government. Federalism divides sovereign authority between the Federal Government and the States, based on the "unique insight [of the Founders] that freedom is enhanced by the creation of two governments, not one." **Alden v. Maine**, 527 U.S. 706,

---

[15] The Gustafsons also challenge the PLCAA under the Fifth Amendment, which we need not address given our decision on their other constitutional claims.

758 (1999). Thus, the Founders gave the Federal Government specific, limited powers and reserved all other powers to the several States. If the Constitution does not explicitly provide Congress with authority to pass a bill, then Congress may not enact it. "In short, a law beyond the power of Congress, for any reason, is no law at all." *Bond v. United States*, 564 U.S. 211, 227–28, (2011) (Ginsburg, J., concurring) (quoting *Nigro v. United States*, 276 U.S. 332, 341, (1928)) (some punctuation omitted).

The Founders feared fully centralized government. They therefore left most governance of daily life to the States. Courts, as a result, "always have rejected readings of the Constitution of the United States that would permit Congress to exercise a police power." *United States v. Morrison*, 529 U.S. 598, 618–19, (2000). As such, "federalism secures to citizens the liberties that derive from the diffusion of sovereign power." *New York v. United States*, 505 U.S. 144, (1992) (quotation marks omitted).

The Federal Government believes Congress could pass the PLCAA under Article I of the Constitution. That Article gives Congress the power to enact certain types of laws, including statutes that "regulate Commerce with foreign Nations, and among the several States . . . ." U.S. Const. art. I, § 8 cl. 3. In defining "Commerce," Chief Justice Marshall said, "Commerce, undoubtedly, is traffic, but it is something more: it is intercourse. It describes the commercial intercourse between nations, and parts of nations, in all its branches, and is regulated by prescribing rules for carrying on that intercourse." *Gibbons v. Ogden*, 22 U.S. 1, 189–90 (1824). This definition

of commerce ensures that the "authority of the Federal Government may not be pushed to such an extreme as to destroy the distinction, which the Commerce Clause itself establishes, between commerce 'among the several States' and the internal concerns of a State." ***N.L.R.B. v. Jones & Laughlin Steel Corp.***, 301 U.S. 1, 30, (1937). "That distinction between what is national and what is local in the activities of commerce is vital to the maintenance of our federal system." ***Id.***

Under the Tenth Amendment of the Bill of Rights, local matters fall under the authority of the individual States. That Amendment provides: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amnd. X.

In addition to their concerns regarding centralized government, the Founders also distrusted a government where power resided in only one institution or individual. They therefore created a tripartite system with built-in checks and balances. Under that system, when a litigant claims a federal statute is unconstitutional, only the courts may decide whether Congress had the constitutional authority to pass the challenged law. ***Marbury v. Madison***, 1 Cranch 137, 176, (1803).

*A.* *The Tenth Amendment and the Commerce Clause*

Here, the Gustafsons challenge the constitutionality of the PLCAA on the grounds that Congress exceeded its enumerated powers. When confronting such a challenge, the "Federal Government . . . must show that a

constitutional grant of power authorizes each of its actions." *National Federation of Indep. Bus. v. Sebelius*, 567 U.S. 519, 535, (2012).  Such a showing "does not apply to the States, because the Constitution is not the source of their power . . . state governments do not need constitutional authorization to act."  *Id.*  "Proper respect for a coordinate branch of the government requires that we strike down an Act of Congress only if the lack of constitutional authority to pass the act in question is clearly demonstrated." *Id.* at 538 (quoting *United States v. Harris*, 106 U.S. 629, 635, (1883)). "Our deference in matters of policy cannot, however, become abdication in matters of law.  'The powers of the legislature are defined and limited; and that those limits may not be mistaken, or forgotten, the Constitution is written.'"  *Id.* (quoting *Marbury*, 1 Cranch at 176).

"Congress needs only a rational basis for concluding that the regulated activity substantially affects interstate commerce . . . But it must be *activity* affecting commerce that is regulated . . . ."  *NFIB* at 657–58 (Scalia, J., dissenting) (emphasis in original).  "Simply because Congress may conclude that a particular activity substantially affects interstate commerce does not necessarily make it so."  *Lopez*, 514 U.S. at 557 n.2.  "Whether particular operations affect interstate commerce sufficiently to come under the constitutional power of Congress to regulate them is ultimately a judicial rather than a legislative question, and can be settled finally only by this Court." *Id.*  And even "modern-era precedents which have expanded Congressional

power under the Commerce Clause confirm that this power is subject to outer limits." *Id.* at 556–57.

Under the Commerce Clause, Congress may only regulate activity that falls into one of three categories:

> First, Congress may regulate the use of the channels of interstate commerce.  Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities. Finally, Congress's commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce, *i.e.*, those activities that substantially affect interstate commerce.

*Id.* at 558–59 (citations omitted).

Although Congress "is not required to make formal findings as to the substantial burdens that an activity has on interstate commerce, . . . congressional findings . . . enable us to evaluate the legislative judgment that the activity in question substantially affected interstate commerce . . . ." *Id.* at 562–63.  *See also Carter*, *supra* (discussing the role that Congress's findings and purposes play in courts' determinations that Congress aimed an enactment at constitutionally permissible ends).  Our "determination whether an intrastate activity is commercial or noncommercial may in some cases result in legal uncertainty." *Lopez*, 514 U.S. at 566.  "The Constitution mandates this uncertainty by withholding from Congress a plenary police power that would authorize enactment of every type of legislation." *Id.*

Whether a rational link between the congressionally regulated activity and interstate commerce exists presents a pure question of constitutional law for the courts. In assessing that connection, we may not "pile inference upon inference in a manner that would . . . convert Congressional Commerce Clause authority to a general police power of the sort held only by the States." *Id.* at 549–50.

Moreover, "the Framers explicitly chose a Constitution that confers upon Congress the power to regulate individuals, not States." *New York v. United States*, 505 U.S. 144, 166, (1992). "The allocation of power contained in the Commerce Clause, for example, authorizes Congress to regulate interstate commerce directly; it does not authorize Congress to regulate state governments' regulation of interstate commerce." *Id.*

The Gustafsons contend that the PLCAA violates the Tenth Amendment and those principles of federalism, because it interferes with the authority of States to decide how to allocate lawmaking functions between their various branches of state government. *See* Gustafsons' Brief at 34. Specifically, they claim that "the PLCAA bars states from imposing liability on negligent gun companies if states have chosen to have their judiciaries establish the relevant liability standards through common law (like Pennsylvania), while allowing identical claims if the states used their legislatures to establish the relevant liability standards." *Id.* (citing 15 U.S.C. §§ 7903(5)(A)(iii)). However, Congress has "no permissible authority to infringe upon a State's decision of which branch of government it chooses to make law." *Id.*

To support their claim, the Gustafsons rely upon ***Erie R.R. Co. v. Tompkins***, 304 U.S. 64 (1938). Under ***Erie R.R. Co.***, the Gustafsons argue that Congress may not disfavor the common law and, at the same time, prefer the enactments of state legislatures. In other words, whether States choose to regulate the negligence and product liability of the gun industry by common law or by statute is purely a state concern. The Gustafsons allege Congress unconstitutionally disfavored and extinguished the common law of torts in the States' courts and impermissibly recodified it as federal law, solely for the gun industry.

The Gun-Industry Defendants do not rebut the Gustafsons' argument. Instead, they insist that "the PLCAA does not violate the Tenth Amendment and principles of federalism, because it does not involve 'commandeering the powers of state executive officials or legislative processes in any manner.'" Gun Industry's Brief at 43 (quoting Trial Court Opinion, 1/15/19, at 9-10). The Gun-Industry Defendants assert this Court must apply the statute under the Supremacy Clause,[16] Congress did not "commandeer" the legislative and executive branches by passing the PLCAA.

This argument is a strawman; the Defendants do not answer the Gustafsons' theory. The Gustafsons never alleged the PLCAA commandeers political branches. They asserted Congress usurped the States' police powers embodied in the common law and the allocation of lawmaking authority

---

[16] ***See*** U.S. Const. art. VI, cl. 2.

between the branches of state government. Therefore, the Gun-Industry Defendants' response misses its target.

Similarly, the Federal Government contends the PLCAA comports with the Tenth Amendment, because it is a valid exercise of the Commerce Clause power and does not commandeer a State's political branches. It relies on **City of New York v. Beretta U.S.A. Corp.** et al., 524 F.3d 384 (2d Cir. 2008), cert. *denied*, 556 U.S. 1104 (2009), where a 2-1 majority of the Second Circuit said, "the critical inquiry with respect to the Tenth Amendment is whether the PLCAA commandeers the States." **Id.** at 7 (quoting **City of New York** at 396). The Second Circuit rooted this conclusion upon its prior holding that the PLCAA was a permissible exercise of Commerce Clause power. However, as we explain, we disagree with the **City of New York** Court's analysis of the Commerce Clause; therefore, its Tenth Amendment analysis is unpersuasive.

Additionally, the Federal Government asserts that we should reject the Gustafsons' Tenth Amendment argument out of hand. It views their challenge as claiming that Congress violated the Constitution by what it elected not to do, rather than by what Congress did. It argues the Gustafsons "urge . . . that Congress violated the Tenth Amendment by including an exception [in the PLCAA] for certain statutory claims." **Id.** at 8. "That Congress did not extend the expectation to certain common-law claims has no bearing on the constitutional analysis." **Id.** The Federal Government says that "[b]ecause the PLCAA fits squarely within Congress's Commerce Clause authority, it cannot violate the Tenth Amendment unless it commandeers the States." **Id.**

at 9 (citing **City of New York**, **supra** (quoting **Connecticut v. Physicians Health Servs. of Conn., Inc.**, 287 F.3d 110, 122 (2d Cir. 2002))).

The Federal Government claims Congress properly exercised Commerce Clause authority, because "Congress determined that, in enacting the PLCAA, the possibility of suits against gun manufacturers and sellers constituted an unreasonable burden on interstate and foreign commerce." Federal Government's Brief at 18 (quoting 15 U.S.C. § 7901(a)(6) (some punctuation omitted)). It offers no further rationale to connect the regulation of state-based lawsuits to interstate commerce.

Accepting the Federal Government's assertion, the trial court cited **Ileto v. Glock, Inc.**, 565 F.3d 1126 (9th Cir. 2009), and agreed with the Ninth Circuit "that it is entirely reasonable that the PLCAA would have a direct and immediate effect on the regulation of interstate and foreign commerce." Trial Court's Opinion, 1/15/19, at 14.[17] The court concluded it was "reasonable for Congress to find that limiting liability in certain situations would directly affect and bolster interstate trade in firearms . . . ." **Id**. at 14-15. The trial court offered no further analysis to support this proposition.

---

[17] The trial court also mentioned the Second Amendment in an attempt to bolster its Commerce Clause theory. Despite the Federal Government's suggestion, the Second Amendment was not an independent basis for the trial court's decision. **See** Federal Government's Brief at 18 n.5. The trial court did not independently analyze the Second and Fourteenth Amendments. Further, the Federal Government does not argue that the PLCAA may be upheld under those Amendments, which we discuss in detail below.

Additionally, the case upon which that court relied was not a Commerce Clause case. In **Ileto**, the plaintiffs did not challenge, and the Ninth Circuit did not consider, whether Congress had the authority to pass the PLCAA under the Commerce Clause. Instead, the plaintiffs in **Ileto** challenged the PLCAA under the Fifth Amendment, as applied retroactively to their pending lawsuit. **See Ileto**, 565 F.3d at 1141. Unlike **Ileto**, the Gustafsons' instant challenge is not based on retroactivity under the Fifth Amendment. They bring a facial challenge that asserts the PLCAA falls outside Congress's enumerated powers.

"When no enumerated power authorizes Congress to pass a certain law, that law may not be enacted, even if it would not violate **any of the express prohibitions in the Bill of Rights** or elsewhere in the Constitution." **NFIB**, 567 U.S. 519 at 535 (emphasis added). In cases such as this, we do not ask whether the law is rationally related to a legitimate governmental interest, as we would under the Fifth Amendment. Instead, we ask whether Congress had constitutional authority pass the bill **at all**.

As the Supreme Court of Pennsylvania observed over a century ago, "It is difficult to lay down a definite rule marking the division lines between intrastate [activity] and interstate commerce . . . to determine with precision and exactness in each case as it arises whether the injured [person] was or was not engaged in interstate commerce . . . ." **Hench v. Pennsylvania R.R. Co.,** 91 A. 1056, 1058 (Pa. 1914). "To hold the scales evenly balanced, so as not to unduly limit the powers of Congress on one hand, nor yet encroach upon the proper exercise of state jurisdiction on the other, is not an easy task

for any court." *Id.* "But there must be a division line at some point in each case, and **the *facts* must be the guide** to determine where that line shall be drawn." *Id.* (emphasis added). Thus, our jurisprudence makes clear that Congress may not draw the division line for itself. Otherwise, every federal law would survive judicial review under the Commerce Clause, because Congress will eventually rationalize vesting all governmental authority in itself.

The trial court erred by blindly accepting Congress's own interpretation of its Commerce Clause authority. Merely because Congress titled this Act the Protection of Lawful **Commerce** in Arm Act does not necessarily mean that the statute regulates "commerce," as a matter of constitutional law. *See*, *e.g.*, *Lopez*, *supra* at 557 n.2. The trial court's excessive deference granted Congress license to interpret the Constitution, *i.e.*, the power "to say what the law is." *See Marbury*, 1 Cranch at 177. Congress has no such power. *Id.*; *see also* U.S. Constitution, Art. I, § 1.

In our constitutional system, only the courts may determine whether Congress has acted within the scope of its enumerated powers. In reviewing any statute, courts are "clothed by [the Constitution] with complete judicial power and, by the very nature of the power, required to ascertain and apply the law to the facts" and to "apply the [Constitution] and reject the inferior statute whenever the two conflict." *Carter* 298 U.S. at 296-97 (some punctuation omitted). Deferring completely to Congress without probing its Commerce Clause assertion of power would be an abdication of judicial duty.

Instead of the Fifth Amendment analysis from ***Ileto***, ***supra***, upon which the trial court erroneously relied, the proper constitutional inquiry is whether Congress has the power to regulate state-based, tort lawsuits, filed in state courts, against the gun industry, under the Commerce Clause. The Federal Government offers no justification to support Congress's bald assertion that lawsuits against the gun industry substantially affect interstate and foreign commerce. And it cites only one decision[18] analyzing the PLCAA under the Commerce Clause – ***City of New York v. Beretta***, ***supra***.

In ***City of New York***, the City, former-Mayor Michael Bloomberg, and others filed a lawsuit against numerous members of the gun industry in federal court. They sought an injunction based on public nuisance to abate harm resulting from the gun industry's alleged negligent and reckless marketing and

---

[18] The Gun-Industry Defendants and the Federal Government cite six appellate cases upholding the constitutionality of the PLCAA. Of those six cases, however, two addressed Fifth Amendment and separation of powers questions. ***Ileto v. Glock, Inc.***, 565 F.3d, 1126, 1138 (9th Cir. 2009), and ***District of Columbia v. Beretta U.S.A. Corp.***, 940 A.2d 163 (D.C. 2008). Of the four remaining cases, three addressed Tenth Amendment concerns. However, they merely adopted the analysis of ***City of New York v. Beretta U.S.A. Corp. et al.***, 524 F.3d 384 (2d Cir. 2008), cert. *denied*, 556 U.S. 1104 (2009), on the Tenth Amendment issue, without independently analyzing the PLCAA's constitutionality. ***See Adames v. Sheahan***, 909 N.E.2d 742 (Ill. 2009), cert. *denied* sub nom. ***Adames v. Beretta U.S.A. Corp.***, 558 U.S. 1100 (2009); ***Estate of Kim v. Cox***, 295 P.3d 380 (Ak. 2013); and ***Delana v. CED Sales***, 486 S.W.3d 316 (Mo. 2016). Thus, the only decision that truly analyzed the Commerce Clause and Tenth Amendment Claims was ***City of New York***. Our review of that case encompasses the analyses of the other courts.

distribution practices. While the suit was before the district court, Congress passed the PLCAA, and the gun industry moved for immediate dismissal. The City opposed the motion, claiming that Exception (iii) to the definition of "qualified-civil-liability action" excluded the lawsuit from the PLCAA's scope.[19] Additionally, the City attacked the law's constitutionality.

The district court refused to dismiss and certified an immediate appeal. The Second Circuit's panel majority reversed. It concluded the PLCAA applied. On the constitutional question, the appellate court found the PLCAA was a valid exercise of Commerce Clause power and permissible under the Tenth Amendment.[20]

The City contended the PLCAA regulated local activities outside of the three, permissible categories of Commerce Clause power. It relied on the Supreme Court decisions in **Lopez**, **supra** (declaring a federal law barring the possession of firearms in school zones unconstitutional, because Congress had regulated activity too-far removed from the stream of interstate commerce) and **Morrison**, **supra** (declaring the Violence Against Women Act, 42 U.S.C. § 13981, unconstitutional, because it criminalized local activity).

---

[19] As we indicated above, Exception (iii) to the PLCAA permits actions based on "a state or federal statute applicable to the sale or marketing of the product." 15 U.S.C. § 7903(5)(A)(iii). The plaintiffs argued that because New York Penal Law statutorily criminalizes public nuisances, the statute met the exception to immunity. N.Y. Penal Law § 240.45.

[20] The dissent believed the majority should not address the constitutional issues. Rather, they should have transferred the case to the Court of Appeals of New York to interpret the New York statute.

The Second Circuit disagreed. It held that the PLCAA fit into the third category of Commerce Clause regulation, due to the substantial economic affect that lawsuits might have on the gun industry. The court distinguished *Morrison* and *Lopez*, because it found a closer "connection between the regulated activity and interstate commerce under the [PLCAA]" than existed in the statutes in those cases. *City of New York*, 524 F.3d at 394. Because Congress only applied the PLCAA to a firearm or ammunition "*that has been shipped or transported in interstate or foreign commerce*," the Second Circuit reasoned the PLCAA raises "no concerns about Congressional intrusion into truly local matters." *Id.* (quoting 15 U.S.C. § 7903(4)) (emphasis by Second Circuit) (some quotation marks omitted). In other words, the Second Circuit opined that the PLCAA's definition of a "qualified product" sufficiently limited the Act's reach. *City of New York* concluded that "there can be no question of the interstate character of the [gun] industry" and "Congress rationally perceived a substantial effect on *the industry* . . . ." *Id.* (emphasis added).

We find this reasoning erroneous. Whether a law regulates *an industry* engaged in interstate or foreign commerce is *not* one of the three categories of Congressional authority under the Commerce Clause. Whether a law regulates *private **activity** that substantially affects interstate commerce* is. *See Lopez*, *supra* at 558-59; *see also NFIB*, *supra*. Merely because a statute impacts an interstate industry, does not automatically mean that statute regulates activity substantially affecting interstate commerce.

Thus, the analysis of **City of New York** (and the three state courts that followed it) is flawed.

Instead, the constitutional rule that the Supreme Court of the United States announced seven years later in **NFIB**, **supra**, controls. There, five Justices rejected the Federal Government's contention that regulating an industry of interstate character equates to regulating activity that substantially affects interstate commerce. The plaintiffs asked whether Congress had power under the Commerce Clause to mandate that individuals buy health insurance[21] when Congress passed the Affordable Care Act (a.k.a., "Obamacare" or "the ACA"), 124 Stat. 119-1025.

The Federal Government defended the individual mandate in two ways. First, it claimed the mandate was a valid exercise of Commerce Clause power. Second, the Federal Government argued the mandate was also valid under Congress's taxation power.[22] "The individual mandate," the Federal Government believed, was "within Congress's [Commerce Clause] power, because the failure to purchase insurance has a substantial and deleterious effect on interstate commerce by creating a cost-shifting problem." **NFIB**, 567 U.S. at 548-49.

---

[21] **See** 26 U.S.C. § 5000A.

[22] **See** U.S. Const. art. I, § 8, cl. 1. The United States Court of Appeals for the Fifth Circuit recently declared the taxation argument constitutionally deficient, because Congress reduced the tax to $0. **Texas v. United States**, 945 F.3d 355 (5th Cir. 2019), *as revised* (Jan. 9, 2020), cert. *granted* sub nom. **California v. Texas**, ___ U.S. ___, 140 S. Ct. 1262, (2020), *and* cert. *granted* sub nom. **Texas v. California**, ___ U.S ___, 140 S. Ct. 1262, (2020).

The ACA's goals were "to increase the number of Americans covered by health insurance and decrease the cost of health care." *Id.* at 538. No one questioned the health-insurance industry's interstate character or Congress's ability to regulate it. "We do not doubt that the buying and selling of health-insurance contracts is commerce generally subject to federal regulation." *Id.* at 650 (Scalia, J., dissenting). Thus, just like the PLCAA, the ACA regulated an industry of an interstate character.

However, Chief Justice Roberts explained that the Founders wrote the Commerce Clause under the presumption that "commerce" meant activity, not inactivity. Congress may regulate the former, but not the latter. In declaring the individual mandate an impermissible exercise of the Commerce Clause, the Chief Justice opined that the mandate did not "regulate ***existing commercial activity***." *Id.* at 552 (emphasis added). Instead, it compelled individuals "to become active in commerce by purchasing a product, on the ground that ***their failure to do so affects interstate commerce***." *Id.* (emphasis added).

The Chief Justice observed that courts "have 'always recognized that the power to regulate commerce, though broad indeed, has limits.'" *Id.* at 554 (quotation omitted). One such limit is that Congress may only regulate active conduct and that conduct must, at a minimum, constitute "existing commercial activity." *Id.* at 552.

In a separate opinion, Justices Scalia, Kennedy, Thomas, and Alito agreed. They added, "If Congress can reach out and command even those

furthest removed from an interstate market to participate in the market, then the Commerce Clause becomes a font of unlimited power, or, in Hamilton's words, 'the hideous monster whose devouring jaws spare neither sex nor age, nor high nor low, nor sacred nor profane.'" *Id.* at 652-53 (Scalia, J., dissenting) (quoting The Federalist No. 33, p. 202 (C. Rossiter ed. 1961)). Because the individual mandate regulated inactivity, those five Justices agreed that the Federal Government could not support the mandate under the Commerce Clause.[23] Through the individual mandate, Congress sought to command "those furthest removed from an interstate market to participate in the market . . . ." *Id.* It tried to force those who did not participate in the health-insurance market to serve as its financial supporters. Thus, the ACA unconstitutionally shifted the costs of health insurance from the industry onto persons who had not entered into a commercial transaction with it.

Congress commits the same constitutional overreach in the PLCAA. The Act regulates the inactivity of individuals who may **never** have engaged in a commercial transaction with the gun industry. As this case demonstrates, the PLCAA reaches out and pulls J.R. Gustafson and his parents into the financial service of the gun market. It forces them to serve as financial sureties for the negligent acts and omissions of the industry by barring the Gustafsons from filing an otherwise valid lawsuit under the common law of

---

[23] The Chief Justice rejected the Federal Government's Commerce Clause theory, but accepted its alternative theory and upheld the individual mandate under Congress's taxation power. Justices Ginsburg, Breyer, Sotomayor and Kagan joined him in that part of his opinion.

Pennsylvania. Critically, neither J.R. nor his parents purchased the gun used to kill him, *i.e.*, they did not engage in commerce of **any** kind. Hence, there was no **existing** commercial activity between the Gustafsons and the gun industry at the time of J.R.'s death for Congress to regulate. Any relation between Josh Hudec's gun and interstate commerce had clearly ended by the time Mr. Hudec brought it into his home for personal use. We hold that merely because, at some point in time, that gun passed through interstate commerce, does not give Congress perpetual authority to regulate any harm it may cause.

There is a beginning and an ending point to Congressional authority over activities that substantially affect interstate commerce. Eventually, interstate commerce must cease, because all commerce has ceased. "The federal regulatory power ceases when interstate commercial intercourse ends . . . ." **Carter**, 298 U.S. at 309. At that point, the activity surrounding the use or misuse of products reverts to a local matter, subject to state, not federal, regulation. This is especially true where, as here, the product kills someone who did not even purchase it.

The Federal Government believes Congress included a constitutionally sufficient limiting clause in the PLCAA, namely the definition of "qualified products" 15 U.S.C. §7903(4). It asserts that this provision keeps the scope of the PLCAA within the bounds of the Commerce Clause. We disagree.

The quintessential example of a valid, limiting clause appears in the National Labor Relations Act ("NLRA").[24]  In the landmark case of *N.L.R.B. v. J&L Steel Corp.*, 301 U.S. 1 (1937), the Supreme Court ruled Congress properly enacted the NLRA under the Commerce Clause, because Congress limited the reach of the NLRA to only those activities that substantially affect interstate commerce.

That case involved labor activities at J&L Steel Corp.'s Aliquippa factory in Beaver County, Pennsylvania.  The Aliquippa workers began unionizing.  In response, J&L fired twelve members of the local union.  The union filed charges with the National Labor Relations Board.  J&L opposed the Board's jurisdiction and claimed the NLRA was unconstitutional.  The Board concluded the firings were unfair labor practices in violation of the NLRA and that those firings "affected commerce" as Congress had defined that term.  It therefore asserted federal jurisdiction and ordered J&L to reinstate the workers with backpay and to stop interfering with unionization rights.  The case eventually reached the Supreme Court.

The Court ruled that the NLRA and the Board's assertion of jurisdiction were constitutional, because the NLRA empowered the Board to act only in cases where unfair labor practices are "***affecting commerce.***"  29 U.S.C. § 160(a) (emphasis added).  The limiting phrase "affecting commerce" was critical to the statute's constitutional success.  Congress tailored that term to

---

[24] 29 U.S.C. §§ 151-168.

ensure that the NLRA only reached local activities truly impacting interstate commerce. In writing for the Majority, Chief Justice Hughes explained, the NLRA did not "impose collective bargaining upon all **industry** regardless of effects upon interstate or foreign commerce." **J&L Steel Corp.**, 301 U.S. at 31 (emphasis added). Instead, the NLRA covered **only activities** that "may be deemed to burden or obstruct that commerce and, thus qualified, it must be construed as contemplating the exercise of control within constitutional bounds." **Id.** The Supreme Court agreed with the Board that the Aliquippa labor dispute closely and intimately connected to interstate commerce.

"Although activities may be intrastate in character when separately considered, if they have such a close and substantial relation to interstate commerce that their control is essential or appropriate to protect that commerce from burdens and obstructions, Congress cannot be denied the power to exercise that control." **Id.** at 37 (citing **Schechter Poultry Corp. v. United States**, 295 U.S. 495 (1935)). But the Court warned Congressional "power must be considered in the light of our dual system of government and may not be extended so as to embrace effects upon interstate commerce so indirect and remote that to embrace them, in view of our complex society, would effectually obliterate the distinction between what is national and what is local and create a completely centralized government." **Id.** "The question is necessarily **one of degree**." **Id.** (emphasis added).

Unlike the NLRA, the jurisdictional limitation clause of the PLCAA (*i.e.,* its "qualified product" definition) is not similarly restrictive. The definition

reaches strictly local events unrelated to interstate commerce; it permits the PLCAA to adjust the common-law rights and remedies of tort victims who were not market participants with the gun industry. The PLCAA thereby immunizes the gun industry from any common-law liability that arises **anytime** after the firearm or ammunition has crossed state lines. This immunity attaches regardless of the degree to which the incidents resulting in liability affect interstate or foreign commerce. And neither Congress nor the Federal government has provided an explanation for how local crimes and local torts burden or obstruct interstate commerce.

Thus, whereas the NLRA is limited in scope to events actively affecting commerce, the PLCAA encompasses local activities involving **any** "firearm, including any antique firearm, or ammunition, or a component part of a firearm or ammunition that **has been shipped or transported** in interstate or foreign commerce," forever. 15 U.S.C. § 7903(4) (emphasis added) (citations omitted). This so-called "jurisdictional limitation" is essentially no limitation at all. Once PLCAA immunity attaches to a qualified product under Section 7903(4), that immunity lasts **into perpetuity**, even if the product has ceased its transportation, injures someone who never entered any commercial transaction, and never again returns to interstate commerce. The assertion that Section 7903(4) adequately restrains the reach of the PLCAA to events that substantially affect interstate commerce fails.

Contrary to Congress's assertion in 15 U.C.S. § 7901(6), the filing of a state lawsuit, in state court, based on state tort law, "is in no sense **an**

*economic activity* that might, through repetition elsewhere, substantially affect any sort of interstate commerce." *Lopez*, 514 U.S. at 567 (emphasis added). Even though lawsuits cost money and may result in the exchange of money, that monetary exchange is *not* commerce. The money is not transactional. It is lawful compensation for the redress of grievances between citizens under the substantive laws and sovereign power of the States. Even where, as here, the lawsuit involves parties from different states, that lawsuit does not become interstate commerce. It is interstate litigation. When the Gustafsons filed this civil complaint in Westmoreland County, they engaged in no "commercial intercourse." *Gibbons*, 22 U.S. at 189-90. They petitioned this Commonwealth for the redress of grievances for the civil wrongs that the Gun-Industry Defendants allegedly perpetrated against their son. Although Congress may dictate the forum for interstate litigation,[25] it may not dictate a States' substantive law regarding such lawsuits.[26]

The PLCAA undoubtedly mandates the substantive law of tort lawsuits for the States. Thus, the Act is a Congressional tort-reform bill, a fact that the historical background of the Act and Congress's purposes for it reveal.

The gun industry lobbied Congress strongly for the PLCAA, because it faces inherent liability risks at common law. Guns "kill approximately 30,000

---

[25] *See* 28 U.S.C. § 1332.

[26] *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938). We discuss the *Erie R.R. Co.* in detail below.

people annually and injure another 60,000 to 84,000." Crow, *Shooting Blanks: The Ineffectiveness of the Protection of Lawful Commerce in Arms Act*, 59 SMU L. Rev. 1813 (2006). "[E]very day in the United States, an average of more than one person is killed, and 45 more are injured, in unintentional shootings." Gustafsons' Complaint at 7. Moreover, the Federal Government's Center for Disease Control "found that the U.S. leads the industrialized world in rates of gun-related deaths among children, with unintentional fatal shootings of children 0 to 14 years of age occurring here at rates 11 times higher than in the other 25 industrialized nations studied." ***Id.***

"The financial burden of [gun] violence, approximately $20 billion per year, falls largely upon two groups: individuals who must care for their injured family members and cities that spend millions every year in an attempt to combat this violence." Crow, at 1813. Because many gun users "are often penniless," ***id.***, in the 1980s and 90s, victims, cities, States, and even the Federal Government began suing the gun industry for compensation and injunctions to alleviate the harm that their products caused. Those plaintiffs raised various common-law theories, such as negligent marketing, negligent supervision, ultra-hazardous activity, public nuisance, and design defect. ***See*** Lytton, SUING THE GUN INDUSTRY: A BATTLE AT THE CROSS ROADS OF GUN CONTROL & MASS TORT at 5-15 (U. MI. Press 2005).

"The increased volume and success of lawsuits against the gun industry prompted firearms sellers and manufacturers to lobby Congress for a law protecting them from this onslaught of litigation." Crow, at 1813. Supporters

of the PLCAA argued that plaintiffs were "misusing the tort system, seeking through litigation gun-control regulation that they [were] unable to achieve legislatively . . . ."  Lytton, **supra**. at 152.  The gun industry believed municipalities were filing "suits *en masse* in order to create overwhelming defense costs that [would] force the industry to settle, regardless of the legal merit of the claims against it."  **Id.**

In advocating for the PLCAA, Senator Craig explained that, because of this increase in civil actions:

> legal, law-abiding [gun] manufacturers have increasingly had to pay higher and higher legal costs to defend themselves in lawsuit after lawsuit that have, in almost every instance, been denied and thrown out of court by the judges when filed largely by municipalities who, obviously frustrated by gun violence in their communities, chose this route.  Instead of insisting that their communities and prosecutors and law enforcement go after the criminal element, they, in large part, in their frustration, looked for an easy way out.  That has brought this legislation to the floor to limit the ability of junk or abusive kinds of lawsuits in a very narrow and defined way, but in no way — and I have said it very clearly — denying the recognition that if a gun dealer or a manufacturer acted in an illegal **or irresponsible way or produced a product that was faulty and caused harm or damage, this bill would <u>not</u> preempt or in any way protect them or immune them from the appropriate and necessary legal sentence.**

151 Cong. Rec. S9,218 (daily ed. July 28, 2005) (Sen. Craig) (emphasis added).

But Senator Craig's promise has proved illusory.  As **Ryan**, **Adames**, and the Gustafsons' case show, PLCAA immunity is not "very narrow."  **Id.**

The Act immunizes the gun industry from every conceivable type of joint and comparable liability known to the common law. In fact, the statute protects gun manufacturers and sellers who, like these Gun-Industry Defendants, allegedly acted in an "irresponsible way or produced a product that was faulty and caused harm or damage." *Id.*

As Senator Craig admitted, the PLCAA is federal, tort-reform legislation. "The Wall Street Journal . . . put it very clearly as to the reality of [the PLCAA,] recognizing that ***tort reform*** is necessary." *Id.* (emphasis added). In the next breath, he acknowledged the elephant in the Senate Chamber – Congressional tort reform is not constitutional. "Congress can't do it in sweeping ways, [so] we have chosen targeted ways to get at the misuse of our court system in large part by the trial bar." *Id.*

The Senator's recognition that the PLCAA is tort reform comports with Congress's findings and purposes for the Act. Congress sought to eliminate the ability of a "***maverick*** judicial officer or petit jury [to] expand civil liability [for the gun industry] in a manner never contemplated by the framers of the Constitution, by Congress, or by the legislatures of the several States." 15 U.S.C. § 7901(a)(7) (emphasis added). But state legislation on the subject undercuts upon Congress's finding that state legislatures uniformly opposed gun-industry liability. If they were, Congress would not have needed to pass the PLCAA; the state legislatures could have enacted it themselves. And the gun industry previously attempted that route with mixed results.

"In response to the wave of lawsuits against the gun industry, the [National Rifle Association] launched a nationwide lobbying campaign in **state legislatures** and Congress to secure statutory immunity for the industry." Lytton, **supra** at 166 (emphasis added). Despite nationwide lobbying, only 32 States passed immunity legislation. **See id.** Furthermore, those 32 States did not enact model statutes. Thus, gun-industry immunity from the common law varied widely in scope. **See id.** Some state legislatures, like the General Assembly of Pennsylvania,[27] only prohibited municipalities from suing the gun industry. Others granted PLCAA-like "blanket immunity from suit with narrow exceptions for guns that malfunction (for example, guns that backfire) and breach of contract . . . ." **Id.** Still others jurisdictions took the opposite course. Three years prior to the PLCAA, "the California legislature **repealed** a provision of [its] Civil Code granting immunity to the gun industry against product-liability claims . . . ." **Id.** at 170 (emphasis added). And the District of Columbia "imposed absolute liability on [gun] manufacturers for any injury caused by certain weapons." Federal Government's Brief at 3 (citing D.C. Code Ann. § 7-2551.02 (rev. 1994).

When it comes to holding the gun industry civilly liable, "Americans have never been of one mind . . . ." **Murphy v. National Collegiate Athletic Association, Inc.**, 584 U.S. ___, ___, 138 S. Ct. 1461, 1468, (2018). Despite widespread disagreement among state legislatures, Congress gave

---

[27] **See** 18 Pa.C.S.A. § 6120(a.1).

the gun industry what it could not achieve State by State – a nationwide moratorium on common-law, joint-and-comparative-liability claims. Congress pronounced such lawsuits to be "based on theories without foundation in hundreds of years of the common law and jurisprudence of the United States that [did] not represent a *bona fide* expansion of the **common law**." 15 U.S.C. § 7901(a)(7) (emphasis added). It called the litigation "an abuse of the legal system [that] constitute[d] an unreasonable burden on interstate and foreign commerce of the United States." 15 U.S.C. § 7901(a)(6).

Even if forbidding States' judiciaries from developing and applying their own common laws were within Congress's grasp, distrust of novel theories of liability does not explain why Congress extinguished the public nuisance, negligence, or product-liability claims upon which most pre-PLCAA plaintiffs founded their lawsuits. Such causes of action had existed for centuries.[28] Yet,

_____

[28] For example, this Commonwealth recognized claims for "a public nuisance" prior to the Civil War. *Lancaster Tpk. Co. v. Rogers*, 2 Pa. 114, 115 (1845) (applying Blackstone, COMMENTARIES ON THE LAWS OF ENGLAND, Vol. 3 § 215). Likewise, claims for bodily injury arising from negligence are not new. *See*, *e.g.*, *Allen v. Willard*, 57 Pa. 374 (1868); *Monongahela City v. Fisher*, 2 A. 87 (Pa. 1886). And the "youngest" of these torts, strict liability for defective products, existed in Pennsylvania for 39 years before the PLCAA. *See Webb v. Zern*, 220 A.2d 853 (Pa. 1966). Other States had recognized that tort for nearly a century. *E.g.*, *MacPherson v. Buick*, 111 N.E. 1050 (NY 1916) (imposing product liability upon the auto industry).

Since 1916, Congress has not attempted to supplant product liability for the auto industry. As the Federal Government explains on one of its websites:

> Congress [created] the National Highway Traffic Safety Administration (NHTSA), which has the power to promulgate

the PLCAA extinguished these historically rooted causes of action in the name

of blocking unprecedented developments in the common law of torts.

Congress's use of the language of torts throughout the PLCAA serves as

additional proof that the Act is tort reform.  For instance, product-defect claims

require that the product be "used as intended or in a ***reasonably***

***foreseeable manner*** . . . ."  15 U.S.C. § 7903(5)(A)(v) (emphasis added).

---

> safety standards for automobiles . . . including those that require seat belts, air bags, and conspicuous brake lights. Importantly, these are seen as ***minimum*** safety standards, establishing a floor but not a ceiling for vehicle safety.
>
> In fact, motor vehicle manufacturers routinely provide greater safety than the standards require.  The threat of lawsuits provides one incentive for manufacturers to exceed safety standards.  For example, before air bags were required, numerous lawsuits were filed by people injured in crashes of cars without air bags.  Plaintiffs argued that their injuries would have been less severe had the car been equipped with air bags . . .
>
> Some have criticized the traditional liability system, exemplified by motor vehicles and many other products, as unfair to manufacturers and costly for consumers . . . Since the 1960s, however, there has been an impressive reduction in the number of deaths from motor vehicle crashes in the United States.  From 1966 to 2004, the rate of such deaths per million miles traveled declined by 74%.

Vernick, Rutkow, & Salmon, *Availability of Litigation as a Public Health Tool for Firearm Injury Prevention:  Comparison of Guns, Vaccines, and Motor Vehicle*, 97 Am. J. Public Health 1991, 1997 (2007), United States Department of Health and Human Services (National Institute of Health) available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2040374/ (last visited July 16, 2020) (emphasis in original).  Congress never explains why the honest car dealer, whose goods are ***not intended*** to inflict harm on anyone or anything, faces stiffer regulations than an industry that produces weapons.

Furthermore, a crime "shall be considered the sole ***proximate cause*** of any resulting" damages. ***Id.*** (emphasis added). Congress did not define "reasonably foreseeable manner" or "proximate cause," likely because it did not need to do so. Such terms are the lingo of torts.

Phrases like "sole proximate cause," amend the substantive common law of torts. In Pennsylvania, for instance, proximate cause is critical to maintain a tort action. A defendant's conduct "is a proximate cause of the plaintiff's harm where the conduct was a substantial factor in bringing about the harm inflicted upon a plaintiff." ***Straw v. Fair***, 187 A.3d at 993. The Supreme Court of Pennsylvania has explained that proximate cause expresses this Commonwealth's "policy related to social and economic considerations." ***Vattimo v. Lower Bucks Hosp., Inc.***, 465 A.2d 1231, 1233 (Pa. 1983). It is a legal question of whether Pennsylvania "will extend the responsibility for the conduct to the consequences which have in fact occurred." ***Id.*** (quoting Prosser, THE LAW OF TORTS § 42 (4th Ed.) (emphasis removed)).

By declaring that an individual's criminal act "shall be considered the sole proximate cause of any resulting death, personal injuries, or property damage," 15 U.S.C. § 7903(5)(A)(v), Congress commands where the States must draw the line of liability. The PLCAA thereby reforms the law of torts and converts it from state to federal law. The Act replaces the local policy decisions of the Supreme Court of Pennsylvania and other state supreme courts regarding local torts with Congress's policy preferences on local issues.

Furthermore, Senator Craig's logic regarding the PLCAA, if taken to its rational ends, would permit Congress's total assumption of police power. He stated that gun-industry members "have increasingly had to pay higher and higher legal costs to defend themselves in lawsuit after lawsuit . . ." 151 Cong. Rec. S9,218 (daily ed. July 28, 2005) (Sen. Craig) (emphasis added). This is irrelevant under the Commerce Clause.

Litigation costs money for nearly everyone who must appear in a court or administrative proceeding, not just the gun industry.[29] Indeed, if we accept the theory that this lawsuit (or lawsuits in the aggregate) affect interstate commerce, simply because litigation costs money, then **every case** in state court – including criminal prosecutions, property disputes, and family law matters – would instantly fall under Congressional control. We are unable and unwilling to surrender the whole body of Pennsylvania law and sovereignty to Congress on such weak grounds. Under Congress's lawsuits-cost-money theory, it would also seem that Congress could simply regulate the practice of law directly, a power traditionally reserved to the supreme courts of each State. Hence, if allowed to play out fully, Senator Craig's reasoning would render States' judiciaries mere administrative law judges for Congress. Under his view of the Commerce Clause, it "is as if federal officers were installed in"

---

[29] The only exception to the filing fees are *pro se* litigants who proceed *in forma pauperis*, but this is a very small percentage of all civil actions. We also recognize that indigent criminal defendants have a right to free legal representation. Perhaps those classes of cases would remain beyond the reach of Congressional legislation under Senator Craig's theory, because the litigants cannot afford to hire attorneys.

the filing offices of every state courthouse "and were armed with the authority to stop" any lawsuit Congress disfavored. *Murphy*, 138 S. Ct. at 1478. "A more direct affront to state sovereignty is not easy to imagine." *Id.*

And Congress's concern with prohibiting frivolous lawsuits makes no sense when, as Senator Craig observed, the state judiciaries barred meritless suits under their respective tort laws *prior to* the PLCAA. He said, "in almost every instance, [suits against the gun industry have] been denied and thrown out of court *by the judges* when filed largely by municipalities who, obviously frustrated by gun violence in their communities, chose this route." 151 Cong. Rec. S9,218 (daily ed. July 28, 2005) (Sen. Craig) (emphasis added). Who then were these "*maverick* judicial officers and petit juries" of which Congress spoke? 15 U.S.C. § 7901(7) (emphasis added). Even if the common law of a State exceeded the bounds tolerable to the citizens of that State, the gun industry's recourse was either the legislature of that State or to the People of that State, not Congress.

As noted, the gun industry attempted that route with varying success. *See Lytton*, *supra*. Some legislatures, such as our General Assembly, barred state courthouse doors to lawsuits by municipalities. But, the refusal of most legislatures to immunize gun industry as fully as it wished "brought [the PLCAA] to the [Congress] floor . . . ." 151 Cong. Rec. S9,218 (daily ed. July 28, 2005) (Sen. Craig). Through the PLCAA, Congress irrationally believed "that, if a gun dealer or a manufacturer acted in an illegal or irresponsible way or produced a product that was faulty and caused harm or damage, [the

PLCAA] would not preempt or in any way protect them or immune them from the appropriate and necessary legal sentence." *Id.* The PLCAA does precisely that and regulates the rights and liability of passive individuals such as J.R. Gustafson and his parents.

We therefore disagree with the trial court and the Second Circuit's view that the PLCAA falls within one of the three categories of constitutional Commerce Clause legislation. Congress did not rationally link the PLCAA to any burden upon interstate commerce that the Constitution recognizes. In fact, the PLCAA greatly resembles the Gun-Free School Zone Act of 1990, which the Supreme Court of the United States declared unconstitutional. In that statute, Congress attempted to criminalize the local conduct of possessing a gun near a school. Congress and the Federal Government rationalized the statute under the Commerce Clause, because they believed that guns near schools would negatively impact education, and therefore the quality of the future workforce, and therefore interstate commerce.

In *Lopez*, *supra*, a criminal defendant, whom the Federal Government charged with violating the statute, challenged his conviction on constitutional grounds. He claimed Congress lacked the power to enact the law. The High Court found the statute unsustainable under the Commerce Clause, because there was "no indication that [Lopez], who merely possessed a gun near a school, had *recently* moved in interstate commerce, and there [was] no requirement that his possession of the firearm have any *concrete tie* to interstate commerce." *Id.* (emphasis added).

The PLCAA, just like the Gun-Free School Zones Act, is unsustainable; it grants the gun industry immunity regardless of how far removed from interstate commerce the harm arises. Congress's attempted exercise of its Commerce Clause power in the PLCAA, without a recent or concrete tie to interstate commerce, puts every victim of a crime or tort within the reach of Congressional regulation. Every state criminal prosecution and civil action impacts a defendant's finances and, potentially, insurance rates. And casualty insurance is an industry operating in interstate commerce, as are criminal and civil defense law firms. However, imposing state-court judgments and executing those judgments are **_not_ _commercial activities_**; they are the manifestation of the States' inherent police power to execute, uphold, and enforce their laws.

Ignoring this simple truth, the Federal Government would instead have us "pile inference upon inference in a manner that would . . . require us to conclude that the Constitution's enumeration of powers does not presuppose something not enumerated, and that there never will be a distinction between what is truly national and what is truly local." **_Lopez_** 514 U.S. at 567–68. Like the Supreme Court in **_Lopez_**, "This we are unwilling to do." **_Id._** at 568.

We instead conclude the trial court erred in finding Congress legislated rationally when Congress asserted that the PLCAA regulates interstate commerce. The Act regulates litigation. Any impact that litigation might have upon interstate commerce, constitutionally speaking, is too remote to displace

State sovereignty over the local torts and the local crimes at issue in those lawsuits.

Having rejected the Federal Government's Commerce Clause argument, we return to the Gustafsons claim that the Act violates the Tenth Amendment. It does.

In **Erie R.R. Co. v. Tompkins**, 304 U.S. 64, the Supreme Court of the United States said, "Congress has **no power** to declare substantive rules of common law applicable in a State whether they be local in their nature or 'general,' be they commercial law or a part of the law of torts." **Erie R.R. Co.**, 304 U.S. at 78 (emphasis added). The Federal Government contends that the Gustafsons' invocation of **Erie R.R.** "is wholly out of place." Federal Government's Brief at 13 n.3. It believes "That case, which stands for the proposition that 'there is no federal general common law,' does not concern the Tenth Amendment." **Id.** (quoting **Erie R.R. Co.** at 78). The Federal Government grasps at straws.

While the High Court did not name the Tenth Amendment in **Erie R.R.**, no one seriously doubts that the case is constitutional jurisprudence and that it divides power between the States and Federal Government. **Erie R.R.** has **blatant** Tenth Amendment implications; the case speaks in Tenth Amendment language. "[T]here stands, as a perpetual protest against [a federal law of torts], the Constitution of the United States, which recognizes and preserves the autonomy and independence of the States – independence in their legislative and independence in their judicial departments." **Erie R.R. Co.** at

78-79 (quoting **Baltimore & Ohio R.R. Co. v. Baugh**, 149 U.S. 368 at 401 (1893) (Field, J., dissenting)). "Supervision over either the legislative or the judicial action of the States is in no case permissible except as to matters by the Constitution *specifically authorized or delegated* to the United States. Any interference with either, except as thus permitted, is an invasion of the authority of the States . . . ." *Id.* at 79 (emphasis added).

The declaration that "there is no federal general common law," was the holding in *Erie R.R.*, as the Federal Government observes. But the Supreme Court built that holding upon the constitutional premise at the heart of the Gustafsons' challenge – namely, that common law (and tort law, in particular) is state law. Therefore, Congress may not nationalize tort law, as it did under the PLCAA. We have no federal common law, because, (1) "Congress has no power to declare substantive rules of common law" and (2) "no clause in the Constitution purports to confer such a power upon the federal courts." *Id.*

Thus, rather than the Gustafsons' reliance upon *Erie R.R.* being "wholly out of place," Federal Government's Brief at 13 n.3, it is spot-on. Congress had "no power" to pass the PLCAA, because, as our above review of the statute has revealed, the PLCAA is tort reform. By defining a "qualified-civil-liability action," Congress pronounced substantive rules of common law and therefore exercised a police power reserved for the several States under the Tenth Amendment.

The Federal Government's claim that the PLCAA does not rewrite the common law for the gun industry, while convenient for its current defensive

purposes, inaccurately portrays the Act's practical application. Its exceptions to the definition of "qualified-civil-liability action" only allow lawsuits based on state or federal statutes. As our review of the Act reveals, Congress abolished the common law dating back centuries for the gun industry. Thus, we agree with the Gustafsons' Tenth Amendment claim. Congress aimed the PLCAA-tort-reform bill directly at the common law and expressly disapproved such causes of action while favoring the statutes of state legislatures and its own.

We are compelled to hold that the definition of "qualified-civil-liability action," 15 U.S.C. § 7093(5), is unconstitutional under the Tenth Amendment and without the force or effect of law.

Also, Section 7902(a) of the PLCAA provides that a "qualified civil-liability action may not be brought in any federal or state court." Because the definition of a "qualified-civil-liability action" is without the force or effect of law, 15 U.S.C. § 7902(a) has no teeth. Nothing is a "qualified-civil-liability action" under the PLCAA. The Act's operable section is therefore equally without the force or effect of law.

Section 7902(b), which directs courts to dismiss any "qualified-civil-liability action," also violates the Tenth Amendment in its own right. To enact a valid statute, Congress must direct the regulation at the activities of private citizens. *See NFIB*, *supra*, and *Murphy v. NCAA*, *supra*. The Federal Government argues Section 7902 is viable, because it regulates the supposedly "private conduct" of the Gustafsons filing of a complaint, under the Pennsylvania Rules of Civil Procedure, in the public records of the publicly

elected Prothonotary of Westmoreland County. In the Federal Government's view, such civil filings, in the aggregate, take a substantial toll on the gun industry, an industry that ships goods in interstate and foreign commerce.

If we accept the Federal Government's theory that filing a state action, in a state court, is within Congress's reach, then the 50 States must forfeit all their sovereignty to the Federal Government. If given enough latitude to pile inference upon inference upon inference, Congress could eventually connect any state-court proceeding to some impact upon one party's finances and therefore interstate commerce. We would thereby poise Congress to consume everything the Tenth Amendment reserves to the States.

For example, in Pennsylvania, every adoption proceeding begins by filing a petition with the Clerk of the Orphan's Court. Every divorce and custody case begins with a filing in the Office of the Prothonotary. The same is true of every property and contract dispute. And, of course, as this case shows, actions based in tort begin with a complaint filed with the Prothonotary. Every state statute and common law is worthwhile, because citizens can file public complaints and public petitions alleging violations of those laws in a trial court or administrative agency. If Congress can declare, as it did in Section 7901 of the PLCAA, that filing a petition or complaint in a state court to vindicate state rights substantially burdens interstate commerce, then what remains for the States to govern under the Tenth Amendment?

Reforming the judicial systems of the States from top to bottom in such a manner goes far afield from the enumerated, limited powers of Congress.

This is definitely **not** the vision that Hamilton, Madison, and the other Founders had in mind when they authored the Constitution. The Federal Government's claim that filing a state lawsuit, based on a state tort, which arose within the boundaries of that state, is private conduct rising to the level of interstate commerce must fail. The Commerce Clause simply does not stretch that far, and the Tenth Amendment forbids it.

*B.*     *The Second/Fourteenth Amendments & Severability*

Having addressed the issues that the parties argued and that the trial court ruled upon, we recall that this Court "may affirm the trial court's order on any valid basis." **Plasticert, Inc. v. Westfield Ins. Co.**, 923 A.2d 489, 492 (Pa. Super. 2007). Even though the Federal Government and the Gun-Industry Defendants have not asserted an alternative basis for affirmation, Congress claimed it could pass the PLCAA under the Fourteenth Amendment to enforce the Second Amendment. **See** 15 U.S.C. § 7901(b). It could not.

The Second Amendment safeguards "the right of **the people** to keep and bear Arms . . . ." U.S. Const. amnd. II. (emphasis added). When Madison wrote those words, he vested the right in "the people," not in associations, firms, partnerships, corporations, other entities, or – in the all-encompassing language of the Fourteenth Amendment – "persons."[30] The distinction

---

[30] The Fourteenth Amendment provides, in relevant parts, that no State shall "deprive any **person** of life, liberty, or property, without due process of law; nor deny to any **person** within its jurisdiction the equal protection of the laws" and "Congress shall have power to enforce, by appropriate legislation, the provisions of this article." U.S. Const. amnd. XIV.

between "people" (*i.e.*, real, living, and breathing humans from whom all sovereignty and consent to governance spring) and "persons" (a term of art that includes legal fictions, such as business entities) is crucial in constitutional law. *See Santa Clara Cty. v. S. Pac. R. Co.*, 118 U.S. 394, (Syllabus of Slip Opinion) (1886) (applying the Fourteenth Amendment to corporate defendants based upon the word "person" in that amendment).

Three years after Congress passed the PLCAA, Justice Scalia explained in *District of Columbia v. Heller*, 554 U.S. 570 (2008), what "the people" in the Second Amendment means. "People" refers to "*a class of persons* who are part of a national community or who have otherwise developed sufficient connection with this country," that is, "all Americans." *Id.* at 581. While these Defendants are American corporations, they are not "Americans" as *Heller* used that term. *Heller* referred to the American People. The Gun-Industry Defendants are "persons" but not "people." Accordingly, they have no Second Amendment rights.

Also, "Like most rights, the right secured by the Second Amendment is not unlimited." *Id.* at 626; *see also id.* at 627 n. 26. The right to keep and bear arms does not include a right to make and sell defective arms or ammunition, to engage in negligent design or marketing, to fail to warn consumers or end users of latent dangers within a product, or to otherwise inflict public nuisance within the several States. There is no constitutional right to negligently or defectively manufacture or sell firearms or ammunition. Nor is there a right to make or sell them in conditions that are less safe than

an alternative design, any more than there is a constitutional right to manufacturer or sell, say, a Ford Pinto with an exploding gas tank. The PLCAA does not survive on this alternative basis.

Finally, having determined that Section 7902 and the definitions of "qualified-civil-liability action" and "qualified product" in Section 7903 of the PLCAA are unconstitutional, we reach the question of severability. If Congress would not have enacted a statute's constitutional provisions without its unconstitutional terms, then the constitutional provisions are not severable; the entire statute must be declared unconstitutional. *See Seila Law LLC v. C.F.P.B.*, 591 U.S. ___, ___, 140 S. Ct. 2183, 2209 (2020) (quoting *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477, 508, (2010)).

The only portions of the PLCAA that do not offend the Constitution are its findings and purposes (in Section 7901) and a few definitions (in Section 7903). These provisions have no force on their own. Accordingly, Congress would not have enacted the constitutional provisions of the PLCAA standing alone. The rest of the PLCAA is not severable; the Act is unconstitutional in its entirety.

Hence, the trial court erred by holding that the PLCAA is constitutional and by sustaining the Gun-Industry Defendants' preliminary objections to the complaint.

In sum, the constitutional safeguards that override the PLCAA are the structural pillars of American government. These principles ensure that local

matters remain under the local authority of the States, and they prevent the Federal Government from becoming all powerful. While such principles may be "less romantic and have less obvious a connection to personal freedom than the provisions of the Bill of Rights or the Civil War Amendments," **NFIB** 567 U.S. at 707, (Scalia, J. dissenting), federalism is fundamental to liberty. It permits the 50 Experiments in Democracy, which the People perform every day in their statehouses and courthouses across this Nation. Congressional tort-reform bills, like the PLCAA, have no place within that system; tort law and statutes reforming it are an exercise of police power reserved to the States under the Tenth Amendment.

Order reversed. Case remanded for further proceedings consistent with this Opinion and for entry of a declaratory judgment in favor of the Gustafsons and against Springfield, Inc., Saloom Department Store, LLC, and the United States of America, declaring that the Protection of Lawful Commerce in Arms Act, 15 U.S.C. §§ 7901-7903, is repugnant to the Constitution of the United States and, therefore, without the force or effect of law.

Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/28/2020